James D. Hopkins, J.
The issue in this habeas corpus proceeding is whether the relator, now an inmate of Matteawan State Hospital by commitment of the Supreme Court, County of Niagara, dated September 21, 1950, is presently capable of understanding the criminal charge lodged against him, and of conferring with his counsel and making his defense.
The relator was indicted by the May, 1950 Grand Jury of Niagara County for the crime of murder in the first degree. He was accused of causing the death of one Lillian Bordeau on or about April 4, 1950 by asphyxiation through hanging. The *723 victim’s body was found on the sidewalk near a house in Niagara Falls, which she and her husband occupied. A short piece of rope was around her neck; the other end was attached to the knob of the back door of the second-story porch. The doors of the victim’s house were locked, but were not of the self-locking variety; no key was found on Mrs. Bordeau’s body. Investigation revealed that her husband, a fireman, had been working during the hours in which the Medical Examiner stated that the death must have occurred. A television set was missing from the house; Mr. Bordeau stated that on the night previous to the discovery of the body, he had talked to his wife on the telephone at about 11:00 p.m. and that she had said that she was watching a television program.
In April, 1950 the relator was also a fireman. He was friendly with both Mr. and Mrs. Bordeau. Apparently suspicion fell upon him, and he was traced to a home of a friend in Rochester. There the television set was found, and the relator admitted that he had given it to the daughter of the friend. A search of his clothing produced a key to the Bordeau house. The relator said that Mr. Bordeau had borrowed money from him, and that on the night before the discovery of the body, he had gone to the Bordeau home and taken the television set and other furniture in satisfaction of the debt, in accordance with an understanding with Mr. Bordeau. The relator also said that Mrs. Bordeau had given him the key to the house some time prior to this incident, and that she had done so apparently because she was infatuated with him, but that he had never accepted her advances.
Following his indictment, the relator was examined through an order of the court by two psychiatrists, who reported that he was suffering from dementia prsecox, paranoid type, and was in such a state of insanity, idiocy, or imbecility as to be unable to understand the nature of the charge pending against him and to make his defense thereto. He was consequently committed to Matteawan State Hospital, apparently without opposition by his counsel.
This is not the first proceeding instituted by the relator for the relief which he now seeks. His petition avers that four other applications have been previously made to this court.[1] In none was he successful. Nevertheless, the ban of res judicata cannot operate to preclude the present proceeding, because obviously the mental condition of a person may improve at any time *724 (Weihofen, Mental Disorder As a Criminal Defense [1954], p. 383; People ex rel. Thaw v. Lamb, 118 N. Y. S. 389).[2] The relator has the burden of proof, however, to demonstrate that he is no longer incapable of understanding the charge against him, and making his defense (People ex rel. Fazio v. McNeill, 4 A D 2d 686).
In the present proceeding testimony was received on behalf of both the relator and the respondent. For the first time the relator was supported by representation of retained counsel, and by the testimony of a qualified psychiatrist, Doctor George S. Cattanach. Doctor Cattanach testified that he had examined the relator on March 26, 1961, and had read the hospital records. It was his unshaken belief that the relator was able to understand the nature of the charge against him and to make his defense. The relator’s attorney testified that he had conferred with the relator, and had received information upon which he had based the petition in this proceeding. The relator testified at length under direct and cross-examination concerning the events of the night before the discovery of the body, and Ms subsequent movements. He said that he had gone to the Bordean home at about 9:30 p.m. of that evening in an automobile driven by a friend, and that this friend had seen him leave the Bordean home and bid good-bye to Mrs. Bordean. He would not, however, divulge the name of the witness, saying that he preferred to keep her anonymous until the trial of the murder charge.
The respondent produced two psychiatrists on the staff of Matteawan State Hospital who testified that from their observation of the relator during several recent interviews, his history, and the hospital records, it was their diagnosis that the relator was afflicted with schizophrenia, paranoid type, and was incapable of understanding the charge against him, and making his defense. They testified that the relator was suspicious and hostile; that he believed that his indictment and commitment were brought about by a conspiracy between the then District Attorney and other law enforcement officers, as well as a group in the Fire Department who were prejudiced against him; and that his present explanation of his movements on the days before and after Mrs. Bordean’s death was bizarre, inconsistent and in part delusional.
*725 The test of mental capacity which the law imposes upon a person accused of crime to determine whether he is capable of standing trial may be simply stated: Does the accused have possession of such mental faculties as to be able to understand the nature of the charge or of making his defensef[3] (See Penal Law, § 1120; Code Crim. Pro., § 662-b). That test differs considerably from the test prescribed for legal responsibility for the crime charged,[4] and from the test prescribed for the capacity to be punished, after conviction,[5] and from the test prescribed for disposition of the accused after acquittal.[6] *726 Despite the simplicity of statement,[7] the operation of the test is difficult and places a serious and heavy burden on the court, where, as here, it is faced with conflicting opinions as to mental capacity by reputable psychiatrists (cf. People v. Wolfe, 198 Misc. 695; People ex rel. Bernstein v. McNeill, 48 N. Y. S. 2d 764; People ex rel. Thaw v. Lamb, 118 N. Y. S. 389). Although expert testimony is vital and greatly aids the court, the ultimate responsibility of decision lies with the court (People v. Wolfe, supra, p. 700; People v. Greene, 203 Misc. 191).
In any case where mental disorder is the issue to be decided, .a perplexing and confusing perspective is presented to the court. All physical illness when it is an element of proof must be established by proper medical testimony, and the trier of the facts may at times be compelled to choose between varying opinions. The process may indeed be difficult, but usually there are some objective signs by which the nature and extent of the illness may be distinguished. In the realm of the mind, however, the boundaries and features of the nature and extent of the disorder are more diffuse and dimly perceived. By the same degree of uncertainty the court frequently finds the issue of mental disorder to be clouded and less sharply defined.[8]
In the present case, however, the issue is further complicated by the unquestioned existence of a physical ailment in the relator — -acromegaly.[9] Acromegaly is a disease or malfunctioning of the pituitary gland.[10] When it occurs after maturity *727 (as in the case of the relator), it is marked by unusual growth and thickening of the bones of the extremities. Doctor Cattanach’s testimony stressed the acromegaly in explaining the relator’s behavior; it was his opinion that the symptoms exhibited by the relator which the doctors at the State hospital found as evidence of schizophrenia were in reality the usual reactions of an acromegaliac. On the other hand, the testimony of the psychiatrists on behalf of the respondent disputed this finding and stated that the symptoms were not common to acromegaliacs, but classically signs of schizophrenia.
The clash of opinion on this basic point has induced the court to examine the medical literature, of which judicial notice is taken.[11] It is fairly clear from the studies made in this field that personality changes accompany the onset of acromegaly (Bleuler, “ The Psychopathology of Acromegaly 113 Journal of Nervous and Mental Disease (1951) 497, 500; Davis, “ Endocrinal Defects and Mental States,” 4 Archives of Neurology and Psychiatry (1920) 185, 188-189; Hurxthal, Hare, Horrax and Poppen, “ The Treatment of Acromegaly”, 9 Journal of Clinical Endocrinology (1949) 126, 146; Menninger, ” The Mental Disturbances Associated with Pituitary Disorders ’ ’, 91 Journal of American Medical Association (1928) 951, 954). One authority found that in the earlier stages of acromegaly outbursts of anger or even homicidal mania may be experienced (Hoskins, Endocrinology (1941), 167). Bleuler reports that there are some small groups of schizophrenic psychoses which are taxed by pathologic states of the pituitary gland, but that such psychoses are rare in acromegaly (Bleuler, op. cit., pp. 510, 499). However, it seems to be a moot point whether the emotional maladjustment arises from the glandular disorder, or from the patient’s reaction to the way society views him (Heist and Crawshaw, “ Testing Patterns in Acromegaly ”, 13 Journal *728 of Clinical and Experimental Psychopathology (1952) 247, 252).[12]
Enough has been said to indicate that acromegaly may in certain cases be the source of mental disorder; whether in a given case the symptoms displayed are schizophrenic or the ordinary sequelae of acromegaly seems to be a matter of observation and diagnosis. It is at this point that the medical testimony differs.
The court cannot say from the comparatively short time that it was able to observe and hear the relator that it could determine his capacity to understand the charge against him, and make his defense. Certainly, there are certain aspects of his story which appear inconsistent, even bizarre; on the other hand, he answered questions directly and without elaboration. Nor is it the court’s function on this hearing to determine the veracity of his story, for that is reserved for the trial.
It is not sufficient under section 662-b of the Code of Criminal Procedure that the relator understand the charge against him; the court finds that he does. He must also be capable of making his defense. “Ability to make a defense, however, means more than capacity to discuss his case with his attorney, answer questions, and to understand the nature of legal proceedings. If relator is to go to trial, he should be able to discuss with counsel, rationally, the facts relating to his case which are within his recollection. He should also be able, rationally, to consider the evidence offered against him, to advise with his attorney concerning it, and to make such decisions as may be necessary for him to make during the course of such a trial.” (People ex rel. Bernstein v. McNeill, 48 N. Y. S. 2d 764, 766; see, also, People ex rel. Fazio v. McNeill, 4 A D 2d 686.)[13]
Viewing the case in its entirety, the court finds that it should be assisted by the opinion of an independent, disinterested psychiatrist. An adversary setting is not always the best *729 method to determine mental condition (Roche, The Criminal Mind [1959], p. 133). Fortunately, the law has provided the court with the power to he informed by such expert testimony under the provisions of section 32 of the Judiciary Law (cf. Note, “Releasing Criminal Defendants Acquitted and Committed because of Insanity; The Need For Balanced Administration,” (68 Yale L. J. 293, 304).[14] Accordingly, the court directs that the Attorney-General submit an order on notice to the attorney for the relator, providing for the appointment of a psychiatrist to be selected by the court, ordering that the relator be examined by such psychiatrist, that the hospital records, the exhibits received on this hearing, and the briefs of counsel be made available to him, that he make a written report to the court, copies of which are to be sent to the Attorney-General and the attorney for the defendant, and that thereafter he shall be available for examination by either or both parties upon the resumption of the hearing to be noticed by either party.

. I.e., before County Judge Schwartz in 1952; before Mr. Justice Gallagher in 1954, before Mr. Justice Supple in 1955; and before County Judge Schwartz in 1958. All such applications were dismissed.

. Because of the abuses which frequent applications of this character have entailed, the District of Columbia and several States have restricted the repetition of an application until the lapse of intervals from six months to five years, as prescribed by statute (Weihofen, Mental Disorder as A Criminal Defense [1954], p. 383). Such a restriction has been held constitutional (Matter of Gestner, 90 Cal. App. 2d 680).

. The test as stated, in the text does not appear in that language in the statutes; it is an amalgam of the wording of section 1120 of the Penal Law and section 662-b of the Code of Criminal Procedure. Thus, section 1120, so far as pertinent, reads: “A person can not be tried, sentenced to any punishment or punished for a crime while he is in a state of idiocy, imbecility, lunacy or insanity so as to be incapable of understanding the proceeding or making his defense.” Section 662-b, so far as pertinent, reads: “If, after giving the district attorney and counsel for the defendant opportunity to be heard thereon, the court is of the opinion that the defendant is in such state of idiocy, imbecility or insanity as to be incapable of understanding the charge against him or the proceedings or of making his defense, the trial or proceedings must be suspended, except as hereinafter provided, until he is no longer in such state of idiocy, imbecility, or insanity as to be incapable of understanding the charge against him and the proceedings and of making his defense, and the court shall commit the defendant to an appropriate institution of the department of correction.”

. Section 1120 of the Penal Law, so far as pertinent, states: “A person is not excused from criminal liability as an idiot, imbecile, lunatic, or insane person, except upon proof that, at the time of committing the alleged criminal act, he was laboring under such a defect of reason as: 1. Not to know the nature and quality of the act he was doing; or 2. Not to know that the act was wrong.” This language in effect embodies the rule in M’Naghten’s Case (10 Cl. & Fin. 200, 8 Eng. Rep. 718).

. Section 481 of the Code of Criminal Procedure so far as pertinent, states: “He may show for cause, against the judgment, 1. That he is insane; and if, in the opinion of the court there be reasonable ground for believing him to be insane, the question of his insanity must be tried as provided by this Code. If, upon the trial of that question, it is found that he is sane, judgment must be pronounced; but if found insane, he must be committed to the state lunatic asylum until he becomes sane; and when notice is given of that fact, he must be brought before the court for judgment.” (See, also, Correction Law, §§ 133, 408.)

. Section 454 of the Code of Criminal Procedure, so far as pertinent, states: “ In the event of such acquittal, the court shall order the defendant to be committed to the custody of the commissioner of mental hygiene to be placed in an appropriate institution in the state department of mental hygiene or the state department of correction which has been approved by the heads of such departments.” The section further provides that upon recommendation of the Commissioner of Mental Hygiene, or upon application of the committed person, the court may direct the latter’s discharge, with or without conditions, “ [i]f the court is satisfied that the committed person may be discharged or released on condition without danger to himself or others

. There appears little reason for the enactment of several different tests in determining the mental capacity of a person involved in the criminal process. It is difficult to perceive why the test of responsibility should be of a different quality from the test of ability to be tried or ability to be punished. One should surely be as broad as the others.

. It is at this point that the disciplines of the law and psychiatry are wedded. But the marriage is an uneasy one: lawyers tend to be skeptical of psychiatric opinion, and psychiatrists are impatient with the law’s rigidity and delays (cf. G-uttmaeher and Weihofen, Psychiatry and the Law [1952], 3-5). Part of the incompatibility stems from a lack of understanding of the other’s purposes and operative procedures; and part from the failure to observe that the psychiatrist directs his attention primarily to the individual, whereas the court directs its attention to both the individual and society.

. All of the doctors testified that the relator was suffering from acromegaly. The doctors at Matteawan State Hospital stated that the acromegaly was in an arrested or dormant condition. It had apparently had its onset after maturity.

. The term “ acromegaly ” is derived from the Greek — akros tip or extremity; megas, large (Hoskins, Endocrinology [1941], p. 164). Its cause is unknown (Bleuler, “The Psychopathology of Acromegaly”, 113 Journal of Nervous and Mental Disease [1951], 497, 507).

. The propriety of taking judicial notice of material not offered in evidence or subject to examination by the parties may be questioned. Articles appearing in medical journals and texts, and not in the record, have been cited by the Court of Appeals (Perlmutter v. Beth David hosp., 308 N. Y. 100, 106-107; People v. Richmond County News, 9 N Y 2d 578, 581-584) and by the United States Circuit Court of Appeals of the District of Columbia (Durham v. United States, 214 F. 2d 862). The practice is supported by text writers, if restricted to professionally authoritative books and reports in a field in which the facts in issue appear (McCormick, Evidence, p. 712; Davis, “ Judicial Notice,” 55 Col. L. Rev., 945, 951).

. A recent study of procedures in the treatment of persons found incapable of standing trial is enlightening; both statistically and functionally (Comment, “ Criminal Law — Insane Persons — Competency to Stand Trial ”, 59 Michigan L. Rev. 1078). It was found that about 51% of the patients were committed to one State hospital because incapable of standing trial, and that the goal of the physicians at the hospital was to restore the accused to “ soundness of mind ”, rather than to the condition of triability. This objective resulted in relatively few (about 16 a year) being discharged to the court for trial as against the number of admissions (about 84 a year).

. Bender attributes personality changes to changes in bodily mechanism or function from disease, leading in some instances to paranoid symptoms (Bender, “ Psychoses Associated with Somatic Diseases that Distort the Body Structure,” 32 Archives of Neurology and Psychiatry (1934) 1000, 1001-1002). However, a more recent work states that no concepts of direct relationship between specific diseases and psychosomatic correlations have been proved, and the true attitude toward such relationships is rather skepticism (Drinker, Psychosomatic Research [1961], 193, 194, 195).

. A psychiatrist has suggested that the test of sanity to stand trial is whether the defendant is incommunicable, or unintelligible (Roche, The Criminal Mind [1959], 42, 110). This test views the defendant from the point of view of the observer, i.e. whether the defendant makes himself understood to the observer and makes sense in what he says.