THE PEOPLE OF THE STATE OF NEW YORK ex rel. LEONARD HH., Appellant, v JESSE NIXON, as Director of Capital District Psychiatric Center, Respondent.

Third Department, July 6, 1989

76

**APPEARANCES OF COUNSEL**

*James T. Donnelly (Sheila E. Shea* of counsel), for appellant.

*Robert Abrams, Attorney-General (Richard J. Dorsey* of counsel), for respondent.

**OPINION OF THE COURT**

LEVINE, J.

Petitioner brought the instant application for a writ of habeas corpus to challenge the legality of his involuntary confinement at the State's Capital District Psychiatric Center (hereinafter CDPC) in Albany County commencing March 18, 1988. He was originally admitted to CDPC November 23, 1987 on a "final order of observation" granted by the City of Schenectady Police Court (CPL 730.40), apparently arising out of criminal charges. Upon the expiration of the 90-day period of observation, petitioner remained at CDPC as a voluntary patient *(see,* Mental Hygiene Law § 9.13). In early March 1988, petitioner notified respondent, the Director of CDPC, of his

intention to discharge himself, whereupon CDPC filed an application for a court order authorizing his involuntary retention *(see,* Mental Hygiene Law § 9.13 [b]). A hearing before Supreme Court on that application was held March 17, 1988. The only proof submitted by CDPC at the hearing was the testimony of Dr. Mangala Sugandhi, a CDPC staff psychiatrist, who had treated petitioner. Although no transcript of that hearing is contained in the record on appeal herein, it is uncontested that in the course of her testimony, Sugandhi opined that petitioner was indeed mentally ill and required treatment, but that he did not, if released, pose a serious threat of harm to himself or others. Based upon that testimony, Supreme Court, in accordance with the holding of *Matter of Scopes* (59 AD2d 203, 205-206), denied CDPC's application and ordered petitioner's immediate release.

On March 18, 1988, within 24 hours of petitioner's release, a psychiatric social worker picked petitioner up at his home in Schenectady County and returned him to CDPC, where he was retained as an involuntary admittee based upon the certificates of two examining physicians *(see,* Mental Hygiene Law § 9.27). Petitioner then brought this writ. A hearing on the application was held March 29, 1988. At the hearing, respondent introduced the testimony of members of a family living next door to petitioner's home concerning petitioner's bizarre behavior arising out of his delusional fixation over the family's then 12-year-old daughter. This testimony was admitted over the objection that the conduct of petitioner described therein all occurred prior to the previous CDPC retention application and hearing and, hence, was barred under principles of res judicata and collateral estoppel. Petitioner's behavior, according to the witnesses, included exposing himself in front of the girl, following her to school, climbing a tree to gain entry to the upstairs of the neighbors' home just as the girl's mother was emerging from a bath, and driving a car upon the sidewalk where the girl and her friends were walking. There was also testimony of the serious emotional impact of petitioner's conduct on the youngster who was the object of his attention.

Respondent also called as a witness at the hearing Dr. Ronald Parks, another CDPC psychiatrist, who had been treating petitioner since his second admission. He testified that petitioner was psychotic, suffering from paranoid schizophrenia with delusions, that petitioner denied he was mentally ill and refused medication, and that, if released, he

would be fully capable of repeating his previous conduct against the child and other members of the neighboring family. There was no testimony that petitioner's mental condition had changed during the 24-hour interim between his court-ordered release on March 17 and when he was readmitted to CDPC, and no evidence of any significant behavioral manifestations of mental illness or dangerousness by him during that brief hiatus.

Following the conclusion of the hearing, Supreme Court rejected petitioner's res judicata arguments, finding that the evidence clearly and convincingly established his mental illness and dangerousness, and ruled that, since his confinement was lawful, the writ should be dismissed. This appeal then ensued.

■ At the outset, we reject respondent's argument that, since petitioner was released from his commitment at CDPC in May 1988, the appeal should be dismissed as moot. The res judicata effect of a prior judicial determination vacating the involuntary confinement of one mentally ill is both a substantial and novel issue, research having disclosed only one decision nationally of direct precedential significance (see, In re Alfred P., 126 NH 628, 495 A2d 1264), and one New York case discussing the issue in the context of prior determinations upholding the confinement of the petitioner (see, People ex rel. Butler v McNeill, 30 Misc 2d 722, 723-724). Moreover, the Mental Hygiene Legal Service, representing petitioner both before Supreme Court and on appeal, has submitted cogent statistical data that the issue is quite capable of recurring and yet typically evading review. This evidence suggests that involuntary confinements are often short in duration and often followed by recommitment within the same year. In 1988, 28 patients at CDPC were released by court order, of which six were involuntarily readmitted to CDPC or some other State mental health facility. Thus, on balance, the elements have been sufficiently established to find that this case represents an appropriate exception to the application of the mootness doctrine (see, People ex rel. Dawson v Smith, 69 NY2d 689, 691; Matter of Hearst Corp. v Clyne, 50 NY2d 707, 714-715; Ughetto v Acrish, 130 AD2d 12, 17, appeal dismissed 70 NY2d 871).

■ Turning then to the merits, petitioner's essential argument is that, because his involuntary recommitment to a State mental health facility entails a serious deprivation of liberty, substantive due process mandates strict application of

res judicata to bar the relitigation of his mental status and need for confinement, as well as the introduction of evidence of his behavior predating the prior proceeding. In so many words, it is petitioner's position that due process incorporates the transactional analysis approach to res judicata *(see, Smith v Russell Sage Coll.,* 54 NY2d 185) and, thus, prevents reconfinement of petitioner in the absence of establishment of a wholly subsequent and independent factual basis from that of his previous retention. We disagree.

The doctrine of res judicata is not of constitutional dimension *(Matter of Hodes v Axelrod,* 70 NY2d 364, 372). To accept petitioner's argument would be substantially to incorporate the double jeopardy principle of the criminal law into civil proceedings for the involuntary commitment for the mentally ill. For much the same reasons expressed by the United States Supreme Court in *Addington v Texas* (441 US 418, 428-430) for rejecting the imposition of the criminal standard of proof beyond a reasonable doubt in civil commitment cases, and in *Allen v Illinois* (478 US 364, 369-375) for refusing to apply the privilege against self-incrimination to psychiatric examinations related to civil commitment proceedings, we decline to accept petitioner's contention. Clearly, the State's objective in confining petitioner is treatment and protection of the public, not punishment or deterrence. The commitment and recommitment policies are replete with procedural safeguards *(see,* Mental Hygiene Law §§ 9.07, 9.27, 9.31). Petitioner may only be confined for as long as he is both mentally ill and likely to be of substantial danger to himself or others *(see, Matter of Scopes,* 59 AD2d 203, *supra).* In addition, he has full access to internal and judicial mechanisms to review his mental condition with reference to the justification for his confinement *(see,* Mental Hygiene Law § 9.13 [b]; § 9.27 [e]; § 9.35; 14 NYCRR 15.7).

Furthermore, by its very nature, litigation concerning the *status* of a person's mental capacity does not lend itself to strict application of res judicata on a transactional analysis basis. As was observed by the court in *People ex rel. Butler v McNeill* (30 Misc 2d 722, 723 [Hopkins, J.], *supra),* a prior denial of an application for release by a psychiatric patient should not operate to bar a subsequent application "because obviously the mental condition of a person may improve at any time". The Restatement (Second) of Judgments also takes the position that prior judicial determinations of legal claims regarding status, such as child custody, mental incompetency

and the lawfulness of a continuing personal disability or restraint, do not irrevocably preclude relitigation of the same claims, nor bar the introduction of the same evidence used in a prior case *(see,* Restatement [Second] of Judgments § 13, comment c; § 24, comment f, illustrations 11, 12; § 31, comments a, d [1982]). Thus, the Restatement holds, where the lawfulness of a continuing disability or restraint is at issue "even a *slight* change of circumstances may afford a sufficient basis for concluding that a second action may be brought" *(id.,* at § 24, comment f [emphasis supplied]). Using similar reasoning, the New Hampshire Supreme Court held, in *In re Alfred P.* (126 NH 628, 495 A2d 1264, 1265-1266, *supra),* that allegations and proof of different acts by a mental patient than those in evidence at the prior involuntary admission proceeding constituted a new cause of action not precluded by res judicata. The court further held that proof of such different acts is not barred by collateral estoppel, since they were not actually litigated in the earlier proceeding *(supra,* 495 A2d, at 1265).

We think that the controlling principles in this case—involving successive involuntary mental health commitment proceedings—are those applied in habeas corpus relitigation. The remedy of habeas corpus comprehensively covers challenges to *all* forms of custodial confinement, including that of the mentally ill. Moreover, in our view, the compelling legitimate interests of both sides for achieving the correct result on the merits of a dispute over confinement of a mentally ill person *(see, Addington v Texas,* 441 US 418, 425-426, *supra)* and the important competing human values at stake (Restatement [Second] of Judgments § 24, comment f [1982]), require the greater flexibility and liberality in addressing relitigation issues that have been employed in habeas corpus cases.

The traditional and historic position is that res judicata does not apply to habeas corpus *(see, People ex rel. Lawrence v Brady,* 56 NY 182). The rule continues to be extant and covers both the claim preclusion and issue preclusion branches of res judicata (7A Weinstein-Korn-Miller, NY Civ Prac ¶¶ 7003.04, 7003.05; *see, Hardwick v Doolittle,* 558 F2d 292, 295, *cert denied* 434 US 1049). Nonetheless, the courts have recognized that some restrictions on successive habeas corpus applications should be imposed to prevent vexatious and harassing repetition of invalid claims already heard and decided, or purposeful withholding of alternative grounds for the writ in an earlier application "in the hope of being granted two

hearings rather than one or for some other such reason" *(Sanders v United States,* 373 US 1, 18). These restrictions permit a court in its discretion to summarily dismiss a subsequent habeas corpus petition on the ground generally referred to in the decisions as "abuse" of the writ *(supra,* at 10-11; *Wong Doo v United States,* 265 US 239, 241). Judicial authority to dismiss successive applications presenting no new grounds or evidence has been codified (CPLR 7003 [b]; 28 USC § 2244).

Under the Federal case law, a Judge has the discretion to dismiss for abuse of the habeas corpus remedy not only when the same ground and facts are presented as in an earlier application, but also when any different facts or grounds for relief contained in the new petition were omitted from earlier applications deliberately or as a result of *inexcusable neglect (Antone v Dugger,* 465 US 200, 204; *Woodard v Hutchins,* 464 US 377, 379; *Wong Doo v United States, supra).* Inexcusable neglect exists when the petitioner was aware of the newly presented evidence or ground at the time of a previous application but fails to explain why he did not avail himself of the opportunity then to submit them *(Woodard v Hutchins, supra,* at 380; *In re Shriner,* 735 F2d 1236, 1240-1241).

■ We have concluded that the foregoing principle, barring habeas corpus relief to a detained person because of abuse of a writ in successive petitions, should reciprocally be applied when the detaining authority similarly abuses the judicial process by seeking to recommit on proof of the same facts which were presented in a prior unsuccessful commitment proceeding or, if different evidence is submitted, the evidence was available for submission at the prior proceeding and the detaining authority fails to offer a reasonable explanation for having omitted to present such evidence. Such mutuality of restriction on relitigation of civil confinement of someone mentally ill by a detaining authority is, in our view, dictated by simple fairness and the important personal liberty interest at stake in such a proceeding. Of course, when the detaining authority relies in the successive proceeding upon evidence of a subsequent deterioration in the patient's mental condition or of later overt acts suggestive of dangerousness, neither abuse of the writ nor res judicata would act as a bar in the relitigation.

In the instant case, CDPC did not present evidence at the hearing on petitioner's challenge to his recommitment that his mental state had deteriorated between his release by order

of Supreme Court on March 17, 1988 and his confinement the next day, or that he engaged in any significant behavior in the interim demonstrating dangerousness to himself or others. Nor did the agency offer any explanation why the evidence of his earlier bizarre conduct was not introduced at the prior hearing. Likewise, there is no basis in the record upon which to find that the CDPC psychiatrist who testified in the second proceeding could not have examined petitioner and been called as a witness at the prior retention hearing. Based upon the foregoing demonstration of what was, in effect, CDPC's abuse of the commitment process, we conclude that Supreme Court should have granted petitioner's application.

CASEY, J. (dissenting). I agree with the majority that the doctrine of res judicata is inapplicable. The doctrine is founded on policy considerations involving the concepts of finality and judicial economy, which must give way to the more important concerns for the health and safety of the individual patient and the general public that are at the heart of an involuntary retention or commitment proceeding. Based upon similar reasoning, however, I disagree with the majority's transposition of general principles applicable in cases involving successive applications for habeas corpus relief to successive involuntary retention and/or commitment proceedings. In the case of successive applications for habeas corpus relief, it is the petitioner who is adversely affected by his own inexcusable neglect, since he will remain in custody even though his detention may be unlawful. By contrast, in a case where lawful grounds exist for the involuntary retention or commitment of a psychiatric patient, it is the individual patient and general public who may ultimately suffer the consequences of the release of a patient who is mentally ill and in need of involuntary care and treatment.

Due to the negligence, inattention or incompetence of an applicant in failing to present all available evidence at the first involuntary retention or commitment proceeding for a mentally ill patient in need of involuntary care and treatment, the majority would deny the patient that treatment unless and until his condition worsens or he commits some additional acts which would themselves justify his commitment. The scope of the potential harm increases dramatically in successive involuntary admission proceedings under Mental Hygiene Law § 9.37, involving a patient who has a mental illness for which immediate inpatient care and treatment in a

hospital is appropriate and which is likely to result in serious harm to himself or others. Under the majority's analysis, if the mental health official neglects to present available evidence of the patient's homicidal or other violent behavior in the first proceeding, the patient cannot be committed in the absence of "evidence of a subsequent deterioration in the patient's mental condition or of later overt acts suggestive of dangerousness".

As long as the patient's constitutional rights have not been violated, it is my view that an involuntary retention, commitment or admission which complies with the requirements of the Mental Hygiene Law should not be invalidated merely because an applicant in a prior proceeding neglected to present all of the available evidence concerning the patient's mental condition. Legitimate concerns for the health, safety and welfare of the individual patient and the general public far outweigh whatever interest may be served by preventing successive proceedings. Accordingly, I would affirm Supreme Court's judgment dismissing the writ of habeas corpus.

MAHONEY, P. J., YESAWICH, JR., and MERCURE, JJ., concur with LEVINE, J.; CASEY, J., dissents and votes to affirm in an opinion.

Judgment reversed, on the law and the facts, without costs, writ of habeas corpus sustained.