*225 OPINION OF THE COURT
Robert F. Julian, J.
This is a proceeding to determine whether or not William A. (the patient) should be retained pursuant to Mental Hygiene Law § 9.27. Mohawk Valley Psychiatric Center (the hospital) is requesting an order of retention for a two-year period. The patient is opposed to retention and seeks an immediate release or an order for a lesser period of retention.
The patient has a significant criminal record. He carries the combined Axis I diagnosis of both schizophrenia and pedophilia. He is a level three sex offender. He also has a diagnosis of borderline intellectual functioning. He presently actively receives auditory hallucinations that direct him to kill, which he claims he is able to overcome. His chart demonstrates that he is a model patient and has work privileges, attends movies with staff and has not posed management problems.
He is treated by Dr. Melendez who testified on behalf of the hospital that the patient is a danger to himself and others because he is actively hallucinating and that there is a connection between his hallucinations and his past acts of sexual abuse of children.
In 1998, as a result of a battery of psychological tests, he was found to be a high risk to reengage in pedophilic activity. The patient complains that, because the test results are stale, this court cannot assume he is presently a risk for pedophilic activity. The patient also argues in the form of a Brandéis brief that psychological tests to determine future dangerousness are unreliable in any event. Both positions are unsupported by any properly adduced medical opinion.
The hospital made a prima facie showing by clear and convincing evidence that the patient has active hallucinations instructing him to kill, that he is a significant risk to repeat pedophilic acts if discharged, that there is a connection between his hallucinations and his pedophilic actions, and that his pedophilia is presently untreated. According to Dr. Melendez, the hospital has not provided any psychotherapy relating to the patient’s pedophilia, because his active hallucinations impede such therapy.
Upon the close of the hospital’s prima facie case, the burden of going forward shifted to the patient.
“Upon trial, once the party bearing the burden of proof establishes a prima facie case . . . the adver *226 sary has the burden of going forward, that is, offering evidence to contradict the prima facie case. See Matter of Philip M, 82 NY2d 238, 244, 604 NYS2d 40; Matter of Commissioner of Social Servs. v Philip De G., 59 NY2d 137, 140, 463 NYS2d 761; Farmers’ Loan & Trust v Siefke, 144 NY 354, 359, 39 NE 358.” (Prince, Richardson on Evidence § 3-202, at 100 [Farrell 11th ed].)
It was a burden the patient did not meet.
Initially the patient denied any prior pedophilic acts (despite his prior convictions); later in his testimony he virtually stated that but for his present hospitalization he would engage in those acts.[1] Indeed after denying ever having had sex with children, he stated that he would not attempt to have sex with children in the future because “I’m not ever going to put myself in that position ever again,” thereby admitting he engaged in prior pedophilic acts. At no time did the patient utter any acknowledgment that pedophilia was wrong. Indeed he gave the clear impression that he regarded the diagnosis of pedophilia as merely a bureaucratic impediment to his discharge.
The court further received a physician’s report in the medical record which quoted the patient’s pronouncement that, if he was discharged from the hospital, he would attempt to have sex with children.[2]
*227 There are therefore several reasons for the court to conclude that this patient remains immediately dangerous to himself and others. He continues to receive violent auditory command hallucinations. He fails to acknowledge his past history of pedophilia while concurrently admitting that history later in his testimony. He clearly lacks insight regarding his condition. (See, Matter of Luis A., 13 AD3d 441 [2004].)
He apparently remains an immediate future danger to others based on the earlier psychological testing and the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV). Pedophilia is a DSM-IV diagnosis. According to the DSM-IV (at 571 [2000]), “[t]he frequency of pedophilic behavior often fluctuates with psychological stress. The course is usually chronic, especially in those attracted to males. The recidivism rate for individuals with pedophilia involving a preference for males is roughly twice that for those who prefer females.” (Emphasis added.) The patient is an obvious significant risk to others— primarily children. His pedophilia remains untreated and obviously requires therapy.
Prior to any future discharge the hospital has a duty to engage in treatment of his pedophilia and to provide a predischarge diagnosis based on that treatment opining that his pedophilia is sufficiently remediated so that he is not a risk to himself and others. At least to date the clinicians at the hospital do not feel he can be discharged and can only project discharge to a highly supervised setting. (See inpatient screening admission note, psychiatric evaluation, Nov. 19, 2004.)
Because the court proposes to take judicial notice of the DSM-IV for the purpose of its conclusions about his future dangerousness, the patient is entitled to a hearing on that matter and has seven days to demand the same. The basis of the judicial notice is that the DSM-IV is a published scientific text which the court facially regards as propounding a “principle [which] is accepted as a valid one in the appropriate scientific community.” (2 McCormick, Evidence, at 378 [5th ed]; People ex rel. Butler v McNeill, 30 Misc 2d 722 [Sup Ct, Dutchess County 1961].) The court regards said scientific report as a facially “safe and proper” opinion and authority, subject to any objection and/or impeachment by the patient. (Brown v Piper, 91 US 37, 42 [1875]; People v Cooper, 219 AD2d 426 [1st Dept 1996].)
Because no exact standard or mechanism exists in New York for the taking of judicial notice in a circumstance such as the case at bar, the court accepts and applies the following:
*228 “The American Law Institute’s Code of Evidence sets up adequate safeguards: (a) by requiring that the party requesting judicial notice furnish the judge sufficient information and give each adverse party notice necessary to enable him to meet the request; (b) by providing that the judge shall decline to take judicial notice of a matter unless it clearly is indisputable; (c) by directing the judge, where the fact would in the absence of judicial notice be determined by the trier of fact, to direct the jury to find the matter as judicially noticed, or, in a nonjury case, to include in the record of the trial a statement of the matter so noticed; (d) by making it mandatory that the judge inform the parties of the tenor of any matter to be judicially noticed by him and afford each of them reasonable opportunity to present to him information relevant to the propriety of taking such judicial notice or to the tenor of the matter to be noticed; and (e) by allowing both the trial judge in proceedings subsequent to trial and the reviewing court to take judicial notice, but requiring in such event that the parties be afforded reasonable opportunity to present information relevant to the propriety of taking such judicial notice and to the tenor of the matter to be noticed.” (Edmund M. Morgan, Judicial Notice, 257 Harv L Rev 269, 293-294 [1944].)
If a hearing is not requested, the petition is granted for a two-year retention order.
The patient, pursuant to law, is granted anonymous status and shall be referred to as William A., and the papers in this matter shall be so redacted.

. Patient’s testimony at 50:
“A. Out in front where the smoke hut is a lot of kids go past there . . .
“A. I don’t touch them.
“Q. Do you want to at all?
“A. No, I don’t know. I’ve been there long enough. I just want out; that’s all I want” (emphasis added).

. Progress note of Dr. Maria Melendez (June 1, 2005):
“The voices tell him to ‘go and kill people’, ‘to go to hell’, but denies hearing voices that tell him to sexually abuse children. His response to this question has never been consistent, but a few months ago, when interviewed to determine compliancy, he reported hearing that type of voices and that he felt he could repeat the abuse. He admits suffering from a mental illness and needs to take his medication, says he will continue when discharged. He denies responding to command hallucinations when crimes were perpetrated, but has responded yes to other interviewers. His insight into the sexual offense is poor. This was evident when he recently went to Court requesting his sexual offender status be reduced. When asked what would he do if he is in the community and sees a child, responded that he will not do anything, since ‘I’m not that hard up.’ ”