FRANCIS S., Petitioner,

v.

James STONE, etc., et al., Respondent.

No. 97 Civ. 2178(LAK).

United States District Court,
S.D. New York.

Feb. 24, 1998.

Steven J. Harkavy, Mental Hygiene Legal Services, New York City, for Petitioner.

Christine E. Morrison, Assistant Attorney General, Dennis C. Vacco, Attorney General of the State of New York, New York City, for Respondent.

Morrie I. Kleinbart, Assistant District Attorney, New York City, for Intervenor Respondent Robert M. Morgenthau District Attorney of the County of New York.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Petitioner Francis S. assaulted a police officer with a knife and then pleaded not responsible by reason of mental disease or defect. As a result, he was committed to the custody of the Commissioner of Mental Health (the "Commissioner"), eventually released on an order of conditions, but then recommitted after a determination by the state courts, affirmed by the New York Court of Appeals, that he suffered from a "dangerous mental defect."

Petitioner now challenges the constitutionality of the New York statutory scheme on the theory that it improperly permitted his recommitment on a showing less demanding than would have been required to commit one not previously acquitted of criminal charges by reason of a mental condition. He contends also that the standard applied by the New York Court of Appeals in affirming the recommitment order was unconstitutional because it permits the perpetual confinement of persons like himself. Additionally, he asserts that the manner in which the state proceedings were commenced "shocks the conscience" and therefore violated the substantive component of the Due Process Clause. Finally, he argues that the evidence supporting his recommitment was so insufficient as to make the recommitment order inconsistent with the Due Process Clause.

This Court holds that the challenge to the New York recommitment scheme as applied to petitioner is without merit. Those acquitted of crimes by reason of insanity are distinguishable from persons subject to civil commitment proceedings, and the Constitution does not require that the two groups be treated identically in all circumstances. Petitioner's suggestion that his release on an order of conditions terminated the state's ability to recommit him under the provisions applicable to insanity acquittees also does not withstand analysis. His attacks on the standard applied by the New York Court of Appeals and the sufficiency of the evidence are similarly unavailing, and his contention that he was deprived of due process of law by the manner in which the state commenced the recommitment proceeding was procedurally defaulted by his failure to raise that contention in the state courts.

### Facts

#### New York's Recommitment Scheme

■ A New York criminal defendant has the burden of establishing by a preponderance of the evidence lack of criminal responsibility by reason of mental disease or defect.[1] A defendant may avail himself of this defense only after the state has proven every element of the crime, including defendant's mental state, beyond a reasonable doubt.[2]

#### Initial Examination of Acquittee

■ Following a determination of not guilty by reason of mental disease or defect, Section 330.20 of the Criminal Procedure Law requires that two qualified psychiatrists examine the acquittee for the existence of a dangerous mental disorder or mental illness.[3] The psychiatric examiners then submit reports to the Commissioner who forwards them to the court which accepted the plea or verdict.[4] Within ten days of the court's receipt of the reports, the court must hold an initial hearing to determine the acquittee's present mental condition. At the hearing, the district attorney has the burden of estab-

---

**1.** N.Y. PENAL LAW § 25.00(2) (McKinney 1998) ("When a defense declared by statute to be an 'affirmative defense' is raised at a trial, the defendant has the burden of establishing such defense by a preponderance of the evidence."); *id.* § 40.15 ("it is an affirmative defense that when the defendant engaged in the proscribed conduct, he lacked criminal responsibility by reason of mental disease or defect. Such lack of criminal responsibility means that at the time of such conduct, as a result of the mental disease or defect, he lacked substantial capacity to know or

appreciate either: (1) the nature and consequences of such act; or (2) that such conduct was wrong.").

**2.** *People v. Kohl,* 72 N.Y.2d 191, 532 N.Y.S.2d 45, 527 N.E.2d 1182 (1988).

**3.** N.Y. CRIM PROC. L. (hereinafter "CPL") § 330.20(2), (3) (McKinney 1994).

**4.** CPL § 330.20(5).

lishing by a preponderance of the evidence that the acquittee currently has a dangerous mental disorder or, alternatively, is mentally ill.[5] The acquittee has a dangerous mental disorder if he suffers from a mental illness [6] and, because of that condition, constitutes a physical danger to himself or others.[7]

If the court is persuaded that the acquittee has a dangerous mental disorder, it must issue a commitment order pursuant to which the acquittee is placed in a secure psychiatric facility for six months.[8] If it determines that the acquittee does not suffer from a dangerous mental disorder but is mentally ill,[9] it must issue an order of conditions and an order committing the acquittee to the care of the Commissioner.[10] Finally, if the court finds that the acquittee suffers from neither a dangerous mental disorder nor a mental illness, the court must discharge the acquittee, either unconditionally or under an order of conditions as described above.[11]

### Retention Applications

■ Once an acquittee has been committed to a secure facility, the Commissioner must timely apply for subsequent orders of retention.[12] The court must hold a hearing on a recommitment application if requested by the district attorney, the acquittee or his counsel, or the mental hygiene legal service and may do so on its own motion in the absence of any request. In order to retain the acquittee, the Commissioner must estab-

lish "by a fair preponderance of the evidence" that the acquittee remains dangerously mentally ill. If the Commissioner meets this burden, the court then orders the acquittee's retention in the secure facility. If not, but the Commissioner establishes that the acquittee is mentally ill, the court must order the acquittee transferred to a non-secure facility.[13] Finally, if the Commissioner establishes neither, then the court must sign a release order and enter an order of conditions.[14]

### Recommitment

Recommitment of an acquittee who is released, at any point in the process, on an order of conditions is accomplished through CPL § 330.20(14). CPL § 330.20(14) provides that at "any time during the period covered by an order of conditions an application may be made by the commissioner or the district attorney ... for a recommitment order when the applicant is of the view that the defendant has a dangerous mental disorder.... If the court finds [after a hearing] that the defendant has a dangerous mental disorder, it must issue a recommitment order."

### Petitioner's Recommitment

### Background—The Initial Commitment

Petitioner's journey through the maze of the criminal and mental health systems has

---

**5.** CPL § 330.20(6); *People v. Escobar*, 61 N.Y.2d 431, 474 N.Y.S.2d 453, 462 N.E.2d 1171 (1984).

**6.** A mental illness is "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation." N.Y. MENTAL HYG. LAW § 1.03(20) (McKinney 1996).

**7.** CPL § 330.20(1)(c)(ii); *Matter of George L.*, 85 N.Y.2d 295, 302, 624 N.Y.S.2d 99, 102, 648 N.E.2d 475 (1995).

**8.** CPL § 330.20(1)(f), (6).

**9.** " 'Mentally ill' means that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center ... is essential to such defendant's welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment." CPL § 330.20(1)(d).

**10.** CPL § 330.20(7). An order of conditions, which is valid for five years and extendable upon good cause for an additional five years, requires the acquittee to comply with a prescribed treatment plan, including required visits to a specific outpatient facility, restrictions on alcohol and drug consumption or place of residence, and "any other condition which the court determines to be reasonably necessary or appropriate." *Matter of Oswald*, 87 N.Y.2d 98, 637 N.Y.S.2d 949, 951, 661 N.E.2d 679 (1995); CPL § 330.20(1)(o). If the acquittee is in the custody of the Commissioner, the order of conditions also forbids the acquittee from leaving the facility without permission. CPL § 330.20(1)(o).

**11.** CPL § 330.20(7).

**12.** CPL § 330.20(8), (9).

**13.** *Id.*

**14.** *Id.*

been long and arduous.[15] Petitioner has been arrested at least twenty-six times, primarily for violent and threatening behavior. He has pleaded guilty to conduct such as assault in the third degree, for brandishing a ten-inch metal pipe at a restaurant bartender and patrons and then biting the officer who asked him to leave, and criminal mischief, for kicking in the glass panel door at another restaurant and beating a metal pipe on the bar while threatening to kill the bartender.

The incidents giving rise to this petition began in 1983, when petitioner happened onto the scene of drug raid and was arrested after refusing police requests to the leave the scene. As he was placed under arrest, petitioner pulled out a six-inch knife and thrust it at an officer. Consequently, he was charged with attempted assault in the first degree[16] and criminal possession of a weapon in the third degree.[17] However, petitioner was released from custody and engaged in criminal conduct in New Jersey which resulted in his arrest and confinement at a psychiatric center there from May 1984 until April 1986. Following his release from that psychiatric facility, petitioner was charged with drunk driving after he drove his vehicle into a parked car in New York, causing a multi-vehicle accident. Shortly thereafter, he was arrested also for possession of heroin, to which he pleaded guilty, and served a short sentence.

On August 7, 1987, petitioner pleaded not responsible by reason of mental disease or defect pursuant to CPL § 220.15 in full satisfaction of the indictment pending against him for the 1983 incident and in return for dropping the drunk driving charge against him. In compliance with CPL § 330.20, New York State Supreme Court Justice Alfred Kleiman immediately held a hearing in which he determined that petitioner was mentally ill but not suffering from a dangerous mental disorder. He ordered petitioner committed to the custody of the Commissioner for 120 days in a non-secure facility, and consequently petitioner was sent to the South Beach Psychiatric Center ("South Beach"). Justice Kleiman issued also a five year order of conditions which required petitioner to comply with the terms and conditions of the treatment plan prescribed by the Office of Mental Health. On December 7, 1987, Justice Kleiman's commitment order expired. Petitioner was then discharged to out-patient care on an order of conditions.

### The First Recommitment Application

In May 1988, due to petitioner's alleged violation of the order of conditions, the Commissioner sought to recommit petitioner to a secure facility. On January 23, 1990, the Office of Mental Health located petitioner, whose whereabouts had been unknown to it for some time, and he was committed to Kirby Forensic Psychiatric Center for examination. Two psychiatrists, after examining petitioner, agreed that he suffered from a dangerous mental disorder. Supreme Court Justice Kenneth Shorter then held a hearing and concluded that petitioner remained mentally ill but did not suffer from a dangerous mental illness as defined in CPL § 330.20(1)(c). Justice Shorter therefore denied the recommitment application but ordered petitioner held in a non-secure facility and amended his order of conditions to specifically forbid the use of alcohol, non-prescribed controlled substances and illegal drugs. Petitioner was discharged from the non-secure facility to an outpatient clinic on November 4, 1990.

### The Second Recommitment Application

After petitioner was discharged, he was arrested on three separate occasions from June 1991 to July 1992 and charged with violently kicking and pushing a police officer, kicking the doors and windows of a police car, head-butting a police officer and kicking him in the groin, and physically breaking the windshield and door window of his girlfriend's car during the course of an argument, among other things.

On August 4, 1992, the Commissioner filed a second recommitment application, this time in the Ex Parte Part of New York Supreme Court, New York County. The Commissioner appended the affidavit of Dr. Aristeo Cas-

---

15. *See generally Matter of Francis S.,* 206 A.D.2d 4, 618 N.Y.S.2d 660 (1st Dept.1994) (describing petitioner's extensive past criminal and mental background).

16. N.Y. PENAL LAW §§ 110, 120.10.

17. *Id.* § 265.02.

tillo, a staff psychiatrist at South Beach who had examined and treated petitioner in 1990, which alleged that petitioner suffered from a dangerous mental disorder and needed care and treatment in a secure psychiatric facility. Copies of the recommitment application were mailed to petitioner in care of South Beach. On August 7, 1992, the day the order of conditions issued in 1987 by Justice Kleiman expired, the recommitment application came before Justice Stanley Parness, who issued an order directing petitioner to appear before him on August 26, 1992, for a hearing on the application. Notice of that order also was sent to petitioner in care of South Beach.

In view of the fact that petitioner had left South Beach in 1987, it is not surprising that he failed to appear on August 26, 1992. The Commissioner then applied for an arrest warrant pursuant to CPL § 330.20(14). Counsel for petitioner objected, contending that the recommitment application and the order to appear had not been served properly upon petitioner and that the application should be dismissed outright. The court adjourned the case until September 9, 1992, to allow for proper service. On August 28, 1992, the Commissioner filed and served an identical recommitment application and a new notice to appear. This time, notice of both the recommitment application and the notice to appear were sent to petitioner at 510 Harvard Avenue, Baldwin, New York, by certified mail. Nevertheless, on September 9, 1992, petitioner again failed to appear before the court and an arrest warrant was issued. On September 10, 1992, petitioner was brought into the custody of the Commissioner.

Supreme Court Justice Edith Miller held a hearing on the recommitment application from November 18, 1992 until January 25, 1993. She concluded that petitioner was mentally ill and had violated his order of conditions, as he repeatedly had done in the past. She concluded also that petitioner, if released, would continue his uncontrollable behavior and that he would not comply with any treatment plan or abstain from drug and alcohol abuse. Justice Miller attributed any good behavior that petitioner had exhibited during the hospital stay to his desire to be discharged from the hospital and his medication regime. She found also that petitioner was intrusive, demanding, argumentative, manipulative, and verbally provocative while in the hospital, although he did not demonstrate any "classic" psychotic symptoms such as hallucinations, delusions or communication disorders.

Despite all this, Justice Miller "reluctantly" denied the recommitment application. Relying on *Matter of Torres*,[18] Justice Miller held that the Commissioner was required to establish by a preponderance of the evidence that petitioner "currently" posed a physical danger to himself or others. That burden, she concluded, had not been met, because petitioner was not dangerous at the time of the hearing in light of the fact that he had been on medication following his arrest.

*The State Appellate Proceedings*

The District Attorney of New York County and the Commissioner appealed Justice Miller's order to the New York Supreme Court, Appellate Division, First Department.[19] They argued that petitioner was suffering from a dangerous mental disorder and should have been recommitted. Petitioner contended *inter alia* that the recommitment provisions of CPL § 330.20 are unconstitutional and that the hearing court was without jurisdiction to consider the recommitment application because it had not been timely served and filed and because the psychiatrist's affidavit in support of the application was legally insufficient.[20]

The Appellate Division reversed and granted the recommitment application.[21] The court agreed that petitioner was mentally ill and that he would revert to "his prior pattern of behavior" once released from a psychiatric facility.[22] Thus, the majority

---

18. 78 N.Y.2d 1085, 578 N.Y.S.2d 870, 586 N.E.2d 53 (1991), *aff'g on majority opinion below*, 166 A.D.2d 228, 560 N.Y.S.2d 440 (1st Dept. 1990).

19. *Matter of Francis S.*, 206 A.D.2d 4, 618 N.Y.S.2d 660 (1st Dept.1994) (per curiam).

20. Pet. Ex. 21, Appellate Division Brief (hereinafter "App. Div. Br.").

21. *Francis S.*, 206 A.D.2d at 19, 618 N.Y.S.2d at 669.

22. *Id.*

concluded, the state had proven by a preponderance of the evidence that petitioner did indeed suffer from a dangerous mental disorder. The majority rejected petitioner's claim that CPL § 330.20 was unconstitutional but held that the state in any event had met the more stringent test for civil commitment by clear and convincing evidence.[23]

Petitioner then obtained leave to appeal to the New York State Court of Appeals[24] where he renewed his constitutional and jurisdictional claims. Petitioner again argued that he had not been proven to be mentally ill or "currently dangerous" within the meaning of CPL § 330.20(1)(c).[25] The Court of Appeals rejected petitioner's arguments and affirmed the Appellate Division's recommitment order.[26] It upheld the finding that petitioner suffered from a dangerous mental disorder, noting that both the hearing court and Appellate Division had found petitioner suffered from a mental illness, the first element of a dangerous mental disorder. Further, it affirmed the Appellate Division's holding that the hearing court had applied an erroneous legal standard in finding petitioner not to be currently dangerous. It reiterated the proper legal standard it had announced earlier that year in *Matter of George L.*,[27] viz. that an insanity acquittee presents a danger if, outside of the controlled hospital setting, he would be non-compliant with medication, prone to substance abuse and, as a result, relapse into illness-driven violent behavior. It therefore upheld the determination that petitioner suffered from a dangerous mental condition.[28]

The Court of Appeals next rejected petitioner's jurisdictional challenges. It held that the recommitment proceeding had been commenced by the filing of the application during the pendency of the order of conditions, not its service upon the insanity acquittee.[29] It held also that the affidavit in support of the application was legally sufficient.[30]

Finally, the Court of Appeals rejected petitioner's due process and equal protection claims. Relying on *Jones v. United States*,[31] the Court of Appeals found that the insanity acquittee's past dangerous criminal conduct permitted differential treatment of insanity acquittees and those subject to civil commitment and that the distinction between the two groups was rationally based on the Legislature's determination that insanity acquittees posed a risk of relapse into dangerousness. The Court of Appeals distinguished *Foucha v. Louisiana*,[32] in which the Supreme Court had invalidated a Louisiana statute that permitted the retention of non-mentally ill acquittees merely on a showing of dangerousness. The Court of Appeals concluded that, unlike the Louisiana scheme, CPL § 330.20 permits recommitment only upon a showing of both mental illness and dangerousness.[33]

### The Habeas Petition

On March 27, 1997, petitioner sought a writ of habeas corpus from this Court, contending that his recommitment pursuant to the CPL violated his federal constitutional rights. The petition asserts four grounds for relief.

First, petitioner argues that the CPL recommitment scheme, as applied to petitioner,

---

23. *Francis S.*, 206 A.D.2d at 21, 618 N.Y.S.2d at 670. The majority rejected petitioner's jurisdictional claims. *Id.*

24. *Matter of Francis S.*, 212 A.D.2d 1071, 623 N.Y.S.2d 62 (1st Dept.1995).

25. Pet. Ex. 21, Court of Appeals Brief (hereinafter "Ct.App. Br .").

26. *Matter of Francis S.*, 87 N.Y.2d 554, 640 N.Y.S.2d 840, 663 N.E.2d 881 (1995).

27. 85 N.Y.2d 295, 624 N.Y.S.2d 99, 648 N.E.2d 475 (1995).

28. *Francis S.*, 87 N.Y.2d at 560–61, 640 N.Y.S.2d at 842–43, 663 N.E.2d 881.

29. *Francis S.*, 87 N.Y.2d at 561, 640 N.Y.S.2d at 843, 663 N.E.2d 881.

30. *Francis S.*, 87 N.Y.2d at 562, 640 N.Y.S.2d at 843, 663 N.E.2d 881.

31. 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).

32. 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).

33. 87 N.Y.2d at 563–64, 640 N.Y.S.2d at 843–44, 663 N.E.2d 881.

violated the Due Process and Equal Protection Clauses because the state courts had determined that petitioner was no longer dangerous and, in consequence, he could not be recommitted without satisfaction of the same requirements applicable to any other candidate for civil commitment.

Second, petitioner argues even if the recommitment scheme is constitutional as applied to him, the manner in which it was applied "shocks the conscience" and therefore violated the substantive component of the Due Process Clause, principally because (a) the initial recommitment application was sent to the wrong address, (b) the psychiatrist whose affidavit supported that application had not examined petitioner in almost two years and stated only that the petitioner "may" be suffering from a dangerous mental disorder, and (c) the additional affirmation that accompanied the second recommitment application was insufficient.

Third, the petition asserts that the standard adopted by the New York Court of Appeals in affirming the recommitment order violated petitioner's right to substantive due process because in substance it permits the state to hold indefinitely any insanity acquittee shown to have a personality disorder that may lead to criminal conduct.

Finally, petitioner contends that the Court of Appeals' decision to affirm the recommitment was unreasonable in light of the evidence presented at the hearing.

The Court dismissed the petition on June 9, 1997, on the alternative grounds that it was untimely in light of Section 101 of the Antiterrorism and Effective Death Penalty Act ("AEDPA")[34] and that it contained a ground for relief—the substantive due process claim to the manner of recommitment—on which petitioner had not exhausted his state remedies. As the Court has been persuaded by an argument first advanced in support of an application for a certificate of appealability ("COA") that the petition is timely, although by the narrowest of margins, the Court, with the parties' consent, construes the application as one for reconsideration and grants that application. This therefore is the Court's decision on reconsideration of the petition.

*Discussion*

*Exhaustion*

■ "[A]ll state remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus."[35] This requirement applies with equal force to insanity acquittees held pursuant to CPL § 330.20.[36] It "is satisfied if the claim has been 'fairly presented' to the state courts."[37] "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition .... [and] have placed before the state court essentially the same legal doctrine he asserts in his federal petition."[38] Respondents[39] contend that petitioner failed to exhaust his state court remedies because he did not raise in the state courts any of the first three grounds upon which he relies here.

*Due Process and Equal Protection Challenges to the Recommitment Scheme*

Petitioner plainly has exhausted his state remedies with respect to his as applied chal-

**34.** 28 U.S.C. § 2244(d)(1).

**35.** *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997); *see also* 28 U.S.C. 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of. a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State"); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Daye v. Attorney General of New York*, 696 F.2d 186, 190 (2d Cir.1982) (en banc).

**36.** *See, e.g., Sheridan v. Wack*, No. 92 Civ. 5178(LBS), 1993 WL 78018 (S.D.N.Y. Mar. 16, 1993).

**37.** *Jones*, 126 F.3d at 413 (*quoting Daye*, 696 F.2d at 191).

**38.** *Daye*, 696 F.2d at 191–92 (citations omitted).

**39.** The exhaustion argument was raised only by the District Attorney of New York County, which was permitted to intervene in order to respond to petitioner's constitutional challenges to CPL § 330.20. Order, May 2, 1997. For simplicity's sake, the Court refers to "respondents" without differentiating as to which raised particular arguments.

lenge to the recommitment scheme, the first ground for relief here. The very first point in petitioner's brief to the New York Court of Appeals was entitled "It Is Constitutionally Impermissible To Apply The Recommitment Procedures Prescribed In CPL 330.20 Subdivision 14, To Insanity Acquittees Adjudged Not To Have A Dangerous Mental Disorder At Their Initial Hearing And Subsequently Released Into The Community." [40] He there relied on *Jones v. United States* [41] and *Addington v. Texas* [42] to argue that an insanity acquittee, once found no longer to be dangerous to society, must be treated in commitment proceedings in the same manner as individuals subject to civil commitment.[43] That is the argument he makes here.[44] The issue therefore was presented fairly to the state court.

*Substantive Due Process Challenge to Recommitment Standard*

Similarly, petitioner's Court of Appeals brief squarely argued that the recommitment application should have been denied as a matter of substantive due process,[45] the very argument he makes here as his third ground for relief. Indeed, he argued to the New York court—as he does here—that *Foucha* forbids continued institutional confinement of an insanity acquittee based on a finding that the petitioner possibly or even probably might get into trouble in the future as a result of a personality disorder.[46] Consequently, the Court holds that the substantive due process challenge to the standard for recommitment was presented fairly to the Court of Appeals.

*Substantive Due Process Challenge to the Manner of Recommitment*

■ The same cannot be said of petitioner's other substantive due process claim, the contention that the manner in which the CPL recommitment scheme was applied to him "shocks the conscience" and therefore violated his substantive due process rights.

In this Court, petitioner contends that his substantive due process rights were violated through (1) the state's alleged failure properly to serve and file the application before the court order of conditions expired, (2) the alleged defectiveness of the application, and (3) the alleged legal insufficiency of the affidavit and affirmation in support of the application.[47] He cites numerous Supreme Court precedents and meticulously recounts the relevant facts in support of his claim. There is simply no doubt that the gravamen of his complaint before this Court rests squarely on the United States Constitution.

Petitioner's brief in the New York Court of Appeals relied on most of the same facts that underlie his substantive due process argument here. Point II argued that the recommitment order should have been reversed because the state failed to serve petitioner prior to the expiration of the order of conditions and that the application was not supported by a legally sufficient affidavit,[48] facts to which he now points in support of the substantive due process argument. But the argument before the Court of Appeals was framed solely as a contention that the state had failed to comply with CPL § 330.20. Indeed, the concluding sentence of that section of the brief asserted that the Office of Mental Health "failed to timely commence a legally sufficient application pursuant to CPL 330.20(14) and thus appellant was entitled to have the application dismissed as a matter of law." [49] The argument did not refer to the federal or state constitutions. No federal cases were cited. The handful of state cases relied upon made no reference to constitutional arguments. Nor was there any reliance on constitutional sources or arguments in the relevant portion of the reply brief save

**40.** *See* Pet. Ex. 21, Ct.App. Br., at 13.

**41.** 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).

**42.** 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

**43.** *See* Pet. Ex. 21, Ct.App. Br., at 13–17.

**44.** *See* Pet. Mem. 14–27.

**45.** *See* Pet. Ex. 21, Ct.App. Br., at 70–79.

**46.** *See* Pet. Ex. 21, Ct.App. Br., at 70–71.

**47.** *See* Pet. Mem. 27–32.

**48.** Pet. Ex. 21, Ct.App. Br., at 31–39.

**49.** *Id.* at 39.

for a citation to *Foucha*—for the uncontroversial proposition that liberty is protected by the federal constitution—in support of the argument that strict adherence to CPL § 330.20(14) is an important matter.[50]

 It is not essential that a federal constitutional argument be precisely labeled as such in a state court in order for its proponent to be deemed to have exhausted his or her state remedies on the point. Nevertheless, the federal constitutional claim is not fairly presented unless the state court is fairly apprised of the nature of the argument. In this Circuit, there are four ways of "fairly presenting" a federal constitutional argument to a state tribunal short of explicitly invoking the Constitution: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." [51]

None of these requirements was satisfied by petitioner's briefs in the New York Court of Appeals. There was quite simply nothing about the manner in which petitioner argued the state's alleged failure to comply with CPL § 330.20(14) that, even with the benefit of hindsight, should have alerted that court "to the claim's federal nature." [52]

Petitioner nevertheless argues that he exhausted his state remedies on this ground because he cited *United States v. Salerno* [53] in his opening brief in the Court of Appeals and because, he asserts, the point was made adequately in his reply brief. Neither contention is meritorious.

*Salerno* upheld against facial constitutional attack the pretrial detention provisions of the Bail Reform Act of 1984.[54] Petitioner referred to it in his Court of Appeals brief only

to suggest that the 145 day period during which he had been incarcerated pending determination of the recommitment application arguably had been unconstitutional.[55] The reference appeared in a section of the brief that argued that CPL § 330.20 violates the Due Process and Equal Protection Clause, not in support of the argument that the manner in which the recommitment proceeding was commenced violated substantive due process. Hence, there was nothing about the reference to *Salerno* that even arguably suggested that petitioner challenged the manner of the institution of the recommitment proceeding on federal constitutional grounds.

 Nor did petitioner's reply brief remedy his failure to present this issue to the state court. To begin with, New York courts steadfastly refuse to consider arguments raised for the first time in reply briefs.[56] Hence, even had the argument been raised in the reply brief, that would not have sufficed. In any case, however, this Court does not regard the passing reference to *Foucha* as adequately presenting the argument now advanced.

For all of these reasons, petitioner failed to exhaust his state court remedies with respect to his substantive due process challenge to the manner in which the recommitment application was instituted against him.

Undaunted, petitioner urges the Court to excuse his failure to exhaust on the grounds that no adequate state corrective process exists by which he now could pursue this claim and, in any case, that the Court of Appeals' rejection of his statutory argument concerning the initiation of the proceeding would make resort to any existing state avenue futile.[57]

 Previously unexhausted claims may be heard by a federal district court "if the [state] corrective process is so clearly deficient as to render futile any effort to

---

50. Int. Mem. Ex. B, at 8–10.

51. *Daye*, 696 F.2d at 194.

52. *Id.* at 192.

53. 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

54. 18 U.S.C. § 3141 *et seq.*

55. Pet. Ex. 21, Ct.App. Br., at 28.

56. *See People v. Ford*, 69 N.Y.2d 775, 777, 513 N.Y.S.2d 106, 107, 505 N.E.2d 615 (1987) (*citing State Farm Fire & Cas. Co. v. LiMauro*, 103 A.D.2d 514, 521–22, 481 N.Y.S.2d 90 (2d Dept. 1984), *aff'd* 65 N.Y.2d 369, 492 N.Y.S.2d 534, 482 N.E.2d 13 (1985)).

57. Pet. Reply Mem. 9–10.

obtain relief."[58] This exception traditionally has been employed where no corrective procedure at all exists to redress a particular constitutional violation or where a corrective procedure exists but "the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process."[59] "The basic inquiry is whether the state [detainee] was given the opportunity for full and fair litigation of his ... claim."[60]

In this case "the state court[s] provided every opportunity for [petitioner] to have raised the issue."[61] Petitioner has shown neither a complete absence of a mechanism for correction of his alleged constitutional violation[62] nor that he was precluded by an unconscionable breakdown from using the process that exists. Nor will this Court infer from the fact that the Court of Appeals rejected petitioner's other claims that it would have been unwilling to give due consideration to this substantive due process claim if it had been submitted properly for its consideration. Consequently, the Court declines to excuse petitioner's failure to exhaust with respect to this ground.

*Procedural Default*

▮▮▮▮ This does not end the inquiry. The exhaustion requirement of 28 U.S.C. § 2254(b) "refers only to remedies still available at the time of the federal petition."[63] The requirement "is satisfied 'if it is clear that [the petitioner's] claims are now procedurally barred under [state] law.' * * * [T]he procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground ... and thus prevents federal habeas corpus review of the defaulted claim unless the petitioner can demonstrate cause and prejudice for the default."[64] Therefore, if petitioner's substantive due process challenge to the manner of recommitment no longer could be heard in the New York courts, then it is deemed constructively exhausted.[65] Absent a showing of cause and prejudice, the Court must dismiss the procedurally defaulted claim and proceed to the merits on petitioner's exhausted claims.[66] If, on the other hand, petitioner still may be heard in state court on his unexhausted substantive due process claim, then his is a "mixed petition" and must be dismissed *in toto*.[67]

▮▮▮▮ Respondents argue that petitioner still has at least two avenues within the New York state courts to raise his substantive due process claim and therefore that this is a mixed petition. First, according to respondents, *People ex rel. Leonard HH*[68] provides

---

**58.** *Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981); *see also* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus ... shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant.").

**59.** *Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir.1977) (en banc), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978).

**60.** *Id.*

**61.** *Id.*

**62.** *See, e.g., Wilwording v. Swenson,* 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (permitting a habeas petition to be heard where there existed not "a single instance, regardless of the remedy invoked, in which the [state] courts have granted a hearing to state prisoners on the conditions of their confinement.").

**63.** *Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

**64.** *Gray v. J.D. Netherland,* 518 U.S. 152, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996) (*quoting Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989)) (citations omitted).

**65.** *See Harris v. Reed,* 489 U.S. 255, 261–63, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Bossett v. Walker,* 41 F.3d 825 (2d Cir.1994) ("if the petitioner no longer has 'remedies available' in the state courts under 28 U.S.C. § 2254(b), we deem the claims exhausted").

**66.** *Grey v. Hoke,* 933 F.2d 117 (2d Cir.1991) ("absent a showing of cause for the procedural default and prejudice resulting therefrom ... [the] claims must therefore be dismissed without reaching the merits").

**67.** *See Rose v. Lundy,* 455 U.S. 509, 521, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (holding "a district court *must* dismiss habeas petitions containing both unexhausted and exhausted claims") (emphasis added).

**68.** 148 A.D.2d 75, 543 N.Y.S.2d 998 (3d Dept. 1989).

for a mental health detainee to challenge his commitment during successive retention applications, even on grounds that were available, but not raised, in previous commitment hearings.[69] Additionally, respondent contends that petitioner could raise his substantive due process claim through a petition for a state writ of habeas corpus.[70]

Petitioner disputes the further availability of any state court forum for his substantive due process claim. He contends that his previous challenge to the recommitment in the New York Court of Appeals forecloses any subsequent litigation of his detention on direct appeal. Moreover, petitioner denies that he could raise the substantive due process challenge in subsequent retention proceedings under CPL § 330.20 because such a challenge would be barred by the doctrine of *res judicata.* Because he believes he has no further recourse in state courts, petitioner argues that his claim must be deemed constructively exhausted. He further argues that the state failed to press a procedural default argument and that the Court therefore should proceed to the merits on all of petitioner's claims.

Certainly it is true that petitioner is not entitled to further direct review of his unexhausted claim in the New York courts. CPL § 330.20(21)(b) permits an insanity acquittee to seek leave to appeal to the Court of Appeals, and petitioner already has done so.[71] But petitioner is not entitled to another appeal to the Court of Appeals to raise issues he could have raised previously.

Likewise, petitioner would be foreclosed from raising his unexhausted claim at any subsequent retention hearings. Although *Leonard HH* leaves open the possibility that petitioner could challenge his continued detention at subsequent retention hearings on the ground that his mental condition had changed, it would not allow petitioner to raise constitutional challenges to the manner in which a prior recommitment proceeding had been initiated. In fact, the *Leonard HH* court held that *res judicata,* even in the mental health context, would bar petitioner from raising a ground for relief in a subsequent hearing that was "omitted from earlier applications deliberately or as a result of inexcusable neglect."[72] In this case, petitioner's counsel has represented that he had no cause for failing to have brought this claim in the earlier state court proceedings.[73] Consequently, it seems all but certain that petitioner would be unable to raise this substantive due process claim at any subsequent retention hearings. Any collateral attack[74] similarly would be denied because petitioner had ample opportunity to raise this issue on direct review.

In sum, this Court finds as to the substantive due process challenge to the manner of his recommitment that "petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)."[75] Therefore, the claim is deemed constructively exhausted.[76]

**69.** Int. Supp. Mem. 3–5.

**70.** N.Y. C.P.L.R. (hereinafter "CPLR") § 7003(a) (McKinney 1980).

**71.** *See* CPL § 330.20(21)(b) ("An aggrieved party may appeal from a final order of the intermediate appellate court to the court of appeals by permission of the intermediate appellate court . . . or by permission of the court of appeals upon refusal by the intermediate appellate court or upon direct application.").

**72.** *Leonard HH,* 543 N.Y.S.2d at 1001.

**73.** Oral Arg. Tr. 9 ("I have no cause for claiming that I didn't raise it.").

**74.** Petitioner may seek a writ of habeas under N.Y. Mental Hyg. L. § 33.15 (McKinney 1996). *See, e.g., Lackey v. Head of Bronx State Psych. Fac.,* No. 93 Civ. 2154(CSH), 1993 WL 183713 (S.D.N.Y. May 25, 1993); *Sheridan v. Wack,* No. 92 Civ. 5178(LBS), 1993 WL 78018 (S.D.N.Y.

Mar.16, 1993); *Martens v. Katz,* No. CV–87–0990, 1987 WL 18773 (E.D.N.Y. Oct. 14, 1987).

**75.** *Grey v. Hoke,* 933 F.2d at 120.

**76.** The Court finds petitioner's argument with respect to waiver of the procedural default patently frivolous. On page 15 of the Intervenor's Memorandum of Law and Appendix in Support of Answer Opposing Petition for a Writ of Habeas Corpus, the intervenor stated that "if there is no procedurally proper manner in which the claims could be raised, they would be procedurally forfeited. In such a case, this Court could not entertain the claim absent a showing of cause for the default and prejudice arising therefrom." Int. Mem. 15 (citations omitted). Even if the respondent or intervenor had not raised the procedural default argument, the Court would raise it *sua sponte. Washington v. James,* 996 F.2d 1442, 1448 (2d Cir.1993) (holding a court "may raise the procedural default defense *sua sponte* "). *But see Trest v. Cain,* —— U.S. ——,

Claims constructively exhausted through procedural default are considered waived "absent a showing of cause for the procedural default and prejudice resulting therefrom." [77] As petitioner has no cause for his failure to bring the claim earlier, the claim is dismissed and the Court will consider the remaining, exhausted claims on their merits.

### The Merits

#### The Challenge to CPL § 330.20

In *Addington v. Texas,* [78] the Supreme Court held that the Due Process Clause precludes civil commitment of those alleged to be mentally ill unless the proponent proves, by clear and convincing evidence, that the subject is both mentally ill and dangerous. [79] Petitioner contends that his release on an order of conditions was a determination that he no longer was dangerous and that his subsequent recommitment was unconstitutional because it did not satisfy the *Addington* standard. Petitioner's arguments variously rely on due process and equal protection analyses. [80] Consequently, the Court considers each ground separately.

### Due Process

The starting point for a due process challenge to the treatment of insanity acquittees is the Supreme Court's decision in *Jones v. United States.* [81] The Court there held that "[w]hen a person charged with having committed a crime is found not guilty by reason of insanity ... a State may commit that person without satisfying the *Addington* [clear and convincing evidence] burden with respect to mental illness and dangerousness." [82] The Court found that a not guilty by reason of insanity verdict " 'establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness,' an illness the defendant adequately proved ... by a preponderance of the evidence." [83] Thus, the legislative determination that an insanity acquittee is dangerous was reasonable [84] and the acquittal itself "support[ed] an inference of continuing mental illness." [85] The Court held that insanity acquittees, unlike civil committees, may be institutionalized only where "the acquittee himself advances insanity as a defense and proves that his criminal act was a product of his mental illness," thereby "diminish[ing] concern as to

118 S.Ct. 478, 139 L.Ed.2d 444 (1997) ("recogniz[ing] some uncertainty in lower courts as to whether, or just when, a habeas court may consider a procedural default that the State at some point has waived, or failed to raise" but declining to rule on the issue).

**77.** *Grey,* 933 F.2d at 121 (*citing Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) and *Wainwright v. Sykes,* 433 U.S. 72, 87–91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

**78.** 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

**79.** *Id.* at 426–27.

**80.** *See, e.g.,* Pet. Mem. 14 ("Once an acquittee has rebutted the presumption of continuing dangerousness and mental illness flowing from his acquittal, he is entitled to the same level of procedural and substantive due process protections as any other candidate for civil commitment."); *id.* at 15 ("The Supreme Court's decision in *Jones v. United States,* is the starting point for an analysis of the due process and equal protection rights of insanity acquittees."); *id.* at 16–17 (detailing the Supreme Court's equal protection analysis in *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966)); *id.* at 19 (relying on Supreme Court's due process

analysis in *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992)).

**81.** 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).

**82.** *Foucha v. Louisiana,* 504 U.S. at 76 (*citing Jones, id.*). The District of Columbia statute at issue required that a criminal defendant who affirmatively established insanity by a preponderance of the evidence at trial automatically be committed. D.C.Code § 24–301(j) (1981) (*cited in Jones,* 463 U.S. at 356). The acquittee subsequently could be released either at a judicial hearing provided upon request 50 days after the commitment or at a judicial hearing held every six months if the acquittee established by a preponderance of the evidence that he was no longer mentally ill or dangerous. D.C.Code § 24–301(d)(2), § 24–301(k).

**83.** *Foucha,* 504 U.S. at 76.

**84.** *Jones,* 463 U.S. at 364.

**85.** *Id.* at 366 ("It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment.").

the risk of error"[86] or "risk that he is being committed for mere 'idiosyncratic behavior.' "[87] "Accordingly, there is no reason for adopting the same standard of proof in both insanity acquittee and civil commitment cases."[88]

Petitioner does not quarrel with the standard for an initial commitment as outlined in *Jones*. Rather, petitioner argues that the lower standard of proof no longer may be applied once an acquittee is found not dangerous to himself or others. Petitioner contends that the Supreme Court's decision in *Foucha* requires that insanity acquittees, once released as not dangerous, may be recommitted only under the higher clear and convincing standard applicable to civil committees. A careful reading of *Foucha* does not support petitioner's position.

The Court in *Foucha* struck down a Louisiana statute which required the commitment of an insanity acquittee until the acquittee proves that he or she is not dangerous, thus requiring the continued commitment of such persons even after they regain their sanity. The majority opinion made clear that the commitment of an insanity acquittee without adherence to the requirements of *Addington* depends upon the dual conclusions, which flow from acquittal on this ground, that the acquittee is both mentally ill and dangerous.[89] Once the acquittee regains sanity, the basis for the commitment provided by the insanity acquittal ends and any further confinement is permissible only if the state prevails in a proceeding subject to the *Addington* rule.[90]

Petitioner argues that his case follows from *Foucha*. He contends that the various determinations that he was not currently dangerous eliminated the basis for subjecting him to recommitment under provisions dealing with insanity acquittees just as Foucha's recovery of his sanity eliminated one of the essential bases for his continued confinement pursuant to the insanity acquittal. But he reads *Foucha* more broadly than is appropriate.

Justice White's opinion, upon which petitioner relies, was joined by Justice O'Connor and three other justices. But Justice O'Connor's concurring opinion made clear that the decision does not establish that a state "may never confine dangerous insanity acquittees after they regain mental health,"[91] much less that insanity acquittees who regain their mental health are entitled to the same due process protections as someone never found not guilty of a crime by reason of insanity. She emphasized instead that states may well confine sane insanity acquittees as long as "the nature and duration of the continued confinement [is] tailored to reflect pressing public safety concerns related to the acquittee's continuing dangerousness."[92] Thus the broad reading that petitioner ascribed to *Foucha*—that once an acquittee regains mental health, he forever after must receive the same due process rights as one subject to civil commitment—simply was not the holding of a majority of the Court.

More fundamentally, even if petitioner's expansive interpretation of the *Foucha* holding were accurate, it would apply only to insanity acquittees who have regained their mental health. The Louisiana statute at issue permitted the indefinite detention of insanity acquittees who no longer are mentally ill but who remain dangerous. The case says nothing about the treatment of an acquittee who remains mentally ill throughout but ceases for a period of time to be dangerous.[93]

**86.** *Id.* at 367.

**87.** *Id.*(citing *Addington v. Texas*, 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)).

**88.** *Id.* at 367–68.

**89.** 504 U.S. at 77–78.

**90.** *Id.* at 78–80.

**91.** *Id.* at 87.

**92.** *Id.*

**93.** *See Hartman v. Summers*, 878 F.Supp. 1335, 1342 (C.D.Cal.1995) (finding that *Foucha* does not hold "that the Constitution requires the state to carry the burden of proof by clear and convincing evidence in situations where the insanity acquittee remains mentally ill"); *State v. Tooley*, 875 S.W.2d 110, 113 (Mo.1994) ("So long as the *Jones* presumption of continuing mental illness has not been broken following an acquittal by reason of insanity, the burden of proof need not shift to the state."); *Hearne v. United States*, 631 A.2d 52, 53 n. 3 (D.C.App.1993) (finding that *Foucha* did not intend for the clear and convincing standard to apply to an insanity acquittee who still is mentally ill).

Petitioner, unlike the acquittee in *Foucha*, has remained mentally ill from the time of his acquittal through today.[94] Indeed, to whatever extent he has not been dangerous, that has been so only when he was medicated in an institutional setting. *Foucha* therefore has no bearing on petitioner's recommitment.

 Nor can petitioner find support in the Due Process Clause itself. "The function of the legal process is to minimize the risk of erroneous decisions."[95] CPL § 330.20, as described above, affords insanity acquittees the opportunity at regular intervals to obtain release by demonstrating by a preponderance of the evidence that they no longer pose a threat to society.[96] Once released, the acquittee cannot be recommitted under the CPL absent the presence of an order of conditions, which is limited in duration to five years unless good cause for an extension is demonstrated.[97] The release de-

terminations are subject to judicial review,[98] and insanity acquittees are represented by counsel at these proceedings.[99] In short, petitioner does not point to any portion of the release or recommitment proceedings that denied him an adequate opportunity to contest his recommitment.[100]

### Equal Protection

 The initial consideration on an equal protection challenge is the appropriate standard of review. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for classification."[101] Because insanity acquittees do not constitute a suspect classification, and recommitment of such acquittees does not implicate a fundamental right,[102] the

94. By opinion dated August 7, 1987 and modified on October 5, 1987, New York Supreme Court Justice Alfred Kleiman concluded that petitioner was mentally ill and directed his confinement by order of commitment until December 7, 1987. *Petitioner's release on December 7, 1987, the date the order of commitment expired was certainly not a finding that petitioner was no longer mentally ill. See Int. Ex. C.* In July 1990, petitioner voluntarily agreed to a modified order of conditions which stated that petitioner "currently suffers from a mental illness for which care treatment in a non-secure facility is indicated." Int. Ex. D. Petitioner was released on November 2, 1990 because the order itself directly limited the duration of custody, not because of any judgment as to his mental state on that date. Consequently, because the Court does not find that petitioner ever demonstrated he was not mentally ill, it construes petitioner's constitutional challenge to refer to the treatment of insanity acquittees like himself who were released upon a determination that they are not dangerous, but who have at all relevant times remained mentally ill.

95. *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) *(citing Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

96. CPL § 330.20(16).

97. CPL § 330.20(1)(*o*).

98. CPL § 330.20(21).

99. N.Y. JUD. LAW § 35(1)(a).

100. Petitioner makes two other due process arguments. First, he contends that CPL § 330.20(1)(f), (6) violates due process by requiring an insanity acquittee's placement in a secure psychiatric facility once the state has carried its burden of demonstrating the acquittee's dangerousness and mental illness. Again, petitioner relies on an erroneous reading of *Foucha* that insanity acquittees must be treated the same as civil committees, and this argument fails for the same reasons as petitioner's standard of proof argument. Second, petitioner asserts that the district attorney may participate in the recommitment procedure of an insanity acquittee, but not a civil committee, *see* CPL § 330.20(8)-(11), (18), and that somehow, this diminishes the insanity acquittee's procedural due process protection. On the contrary, the participation of the District Attorney heightens the accuracy of the judicial determination, the interest protected by the Due Process Clause. *See Heller v. Doe by Doe*, 509 U.S. 312, 332, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) *(citing Mathews*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18).

101. *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

102. Although the Supreme Court recognized in *Foucha* that insanity acquittees have a liberty interest at stake, the Court addressed this interest only in the context of insanity acquittees, like Foucha himself, who have regained their sanity. Nowhere does the Court suggest that an acquittee who remains mentally ill is entitled to the same "freedom from bodily restraint" as other citizens. To the contrary, the Court's analysis implies that any liberty interest an acquittee might have arises only when the acquittee no

statutory scheme for recommitment must be upheld if the New York Legislature has any rational basis for distinguishing between insanity acquittees and persons subject to civil commitment.

■ That rational basis is found in the obvious danger posed by the release of insanity acquittees into the community at large. Unlike persons subject to civil commitment, insanity acquittees have been proven beyond a reasonable doubt to be dangerous based on their past criminal activity.[103] Predictions of dangerousness are far from determinations of objectively knowable, measurable facts. Once released, insanity acquittees still pose a risk, as demonstrated by petitioner himself, of returning to dangerous behavior. "[T]he lesson ... is not that government may not act in the face of this uncertainty, but rather that courts should pay particular deference to reasonable legislative judgments." [104] In adopting the statute challenged here, including the provisions concerning recommitment of acquittees released as not dangerous, the Legislature was particularly concerned with the protection of the society at large and with the safety of the insanity acquittees themselves.[105]

Given the obviously legitimate state interest in public safety and the fact that an insanity acquittee, unlike a person subject to civil commitment, has engaged in dangerous behavior in the past, the Legislature quite rationally could conclude that insanity acquittees who have been released as not dangerous at a particular moment in time ought to be subject to recommitment during the order of conditions period upon a showing, by a preponderance of the evidence, that they again are dangerous.[106]

*Substantive Due Process Challenge to "Dangerous Mental Disorder"*

■ In addition to his challenge to CPL § 330.20, petitioner contends that the New York Court of Appeals' interpretation of the standard of dangerous mental disorder violates substantive due process because it would permit perpetual confinement of persons like himself. In particular, petitioner relies on *Foucha* to argue that he cannot be confined on the basis of a mere antisocial personality disorder for which he has dis-

---

longer can be held as a mental patient, that is, once he or she has regained their sanity. To hold that insanity acquittees who suffer from mental illness possess a fundamental right to liberty would subject all detention and evaluation procedures applicable to the mentally ill or incompetent to a strict scrutiny analysis, an outcome not supported by Supreme Court precedent. *See Jones v. United States*, 463 U.S. at 368 (analyzing standard of review for differing standards of proof between insanity acquittees and civil committees in terms of legislative reasonableness); *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (analyzing indefinite institutionalization of incompetent defendants in terms of "reasonable relationship" between the measure and its purpose); *O'Connor v. Donaldson*, 422 U.S. 563, 575–76, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (invalidating confinement of non-dangerous mentally ill persons because no legitimate state interest in the confinement).

103. *See Jones*, 463 U.S. at 364 & n. 12 (distinguishing insanity acquittees from civil committees based on "[t]he fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act [which] certainly indicates dangerousness").

104. *Jones*, 463 U.S. at 365 n. 13.

105. The legislative commission which recommended the statute found that because "[p]sychiatry cannot now guarantee the safety of the public from future dangerous acts of persons found not responsible ... and will most likely be unable to do so in the foreseeable future, the procedures governing commitment, treatment, and release of such defendants are critically important. . . . [T]he mental condition of the defendant when released into the community—is the basis of public and professional concern." N.Y. Law Rev. Comm. Rep. (1981), 1981 McKinney's Session Laws of N.Y. 2261 (*cited in Matter of Oswald N.*, 87 N.Y.2d 98, 105, 637 N.Y.S.2d 949, 952, 661 N.E.2d 679 (1995)).

106. *See Jones*, 463 U.S. at 370 (upholding differing legal standards for commitment of insanity acquittees and civil committees based in part on legislature's reasonable conclusion that commission of a criminal act indicates dangerousness). In fact, although a majority of the *Foucha* Court did not reach the equal protection issue, *compare Foucha*, 504 U.S. at 84 (plurality equal protection analysis), *and id.* at 88 (O'Connor, J. *concurring*) (finding it "unnecessary to reach equal protection issues on the facts before us"), Justice O'Connor at least suggested that even now sane insanity acquittees might be detained if the nature and duration of the detention were tailored to public safety concerns. For reasons outlined above, CPL § 330.20, because it permits release

played dangerous behavior in the past. Nor, petitioner contends, may he be deemed dangerous based entirely on the fact that he "invariably deteriorates" when not in a psychiatric institution. Instead, petitioner reiterates that the state must adequately demonstrate that the insanity acquittee is "currently mentally ill and dangerous" in order to recommit him.

Petitioner's argument is without merit. In the first place, petitioner engages in a highly selective reading of the record to conclude that petitioner was committed on the basis of past dangerousness alone. Five of the six psychiatrists who testified at the hearing on the recommitment application concluded that petitioner suffers from manic bipolar disorder, in addition to an antisocial personality disorder, attention deficit disorder and substance abuse.[107]

More fundamentally, there is no constitutional infirmity in assessing petitioner's dangerousness based on predictions of his behavior once he leaves the care of the hospital, including his proclivity to discontinue his prescribed course of medication and treatment. In *United States v. Murdoch*,[108] the Ninth Circuit held it permissible to confine an insanity acquittee because of the individual's likely behavior upon leaving the confines of the mental institution. "Because [petitioner] is in confinement, he is in a controlled environment. He also is receiving treatment. Simply because [he] is not in a situation in which he will react dangerously does not mean that he no longer suffers from a mental disease which causes his dangerous propensi-

ties."[109] Similarly, the Fifth Circuit upheld the confinement of an insanity acquittee where the district court concluded that there was "no assurance in the record that he would continue to take his medication [that would lessen his symptoms] once released."[110] Because the New York Court of Appeals concluded that petitioner suffered from a mental illness and that he would revert to assaultive and dangerous behavior once discharged from a controlled environment, there was no substantive due process violation in the dangerousness standard applied to the petitioner.

### Review of the State Court Findings

Petitioner's final argument is that his recommitment was unreasonable in light of the evidence presented at the commitment hearing.[111] It is necessary first to address the appropriate scope of review.

Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Typically, the petitioner bears "the burden of rebutting the presumption of correctness *by clear and convincing evidence*."[112] However, "mixed question[s] of law and fact" are not entitled to the presumption of correctness.[113] While the issues raised by petitioner relating to the veracity and credibility of the expert psychiatric witnesses who testified at petitioner's commitment hearing are presumed correct,[114] at least one court has held that the determination of an insanity acquittee's mental illness and dangerousness for purposes of recommitment is a mixed ques-

upon a showing of sanity or non-dangerousness, comports with Justice O'Connor's suggested test.

107. *Cf. Levine v. Torvik*, 986 F.2d 1506, 1513 (6th Cir.) (petitioner was not displaying any signs of active mental illness and none of the eleven witnesses who testified thought he should be hospitalized because he was not then dangerous), *cert. denied*, 509 U.S. 907, 113 S.Ct. 3001, 125 L.Ed.2d 694 (1993).

108. 98 F.3d 472 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2518, 138 L.Ed.2d 1019 (1997).

109. *Id.* at 476.

110. *United States v. Jackson*, 19 F.3d 1003, 1007–08 (5th Cir.), *cert. denied*, 513 U.S. 891, 115 S.Ct. 237, 130 L.Ed.2d 160 (1994).

111. *See* Pet. Mem. 36–63; 28 U.S.C. § 2254(d)(2) ("An application for a writ of habeas corpus . . . shall not be granted . . . unless the adjudication of the claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.").

112. 28 U.S.C. § 2254(e)(1) (emphasis added).

113. *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982).

114. *See Dickerson v. Fogg*, 692 F.2d 238, 243 (2d Cir.1982) (finding presumption of correctness attaches to "recital of external events and the credibility of their narrators"). The presumption applies not only to the findings of the trial court, but also to those of the state appellate courts. *Ventura v. Meachum*, 957 F.2d 1048, 1055 (2d Cir.1992).

tion of law and fact and therefore is not entitled to the strong presumption of correctness under Section 2254(e)(1).[115] Even without the presumption in favor of the state courts' determinations, however, it is abundantly clear that more than sufficient evidence was presented on the record to justify petitioner's recommitment.

The hearing to determine whether petitioner currently suffered from a dangerous mental disorder—the prerequisite for statutory recommitment under CPL § 330.20(14)—lasted more than three months, generated more than 1,500 pages of mostly psychiatric testimony and included as evidence 1,800 pages of petitioner's psychiatric records.[116] Six psychiatrists testified at the proceeding, three for the state and three for petitioner. All testified that the petitioner was then mentally ill. The three doctors who treated petitioner during his confinement and outpatient care testified that he suffered from bipolar disorder, psychotic misperceptions, attention deficit disorder and antisocial personality disorder.[117] Most tell-

ingly, the psychiatrists testifying on behalf of petitioner concurred that he was then mentally ill.[118] All of the psychiatrists noted petitioner's extensive history of drug and alcohol abuse and found that petitioner's symptoms were exacerbated by his use of these substances. Among the other symptoms to which some or all of the psychiatrists testified were petitioner's delusions of persecution and grandeur, irritable and moody conduct, periods of psychotic episodes and paranoia.[119] In sum, petitioner's mental illness was not seriously in dispute.[120]

As to the dangerousness prong, the psychiatrists' testimony was likewise almost unanimous. Dr. Ibanez's report indicated that petitioner suffered from impaired judgment, had "maladaptive patterns of behaviors and could be harmful to self and others," and manifested "repeated criminal offenses and [a] lack of understanding of this behavior that is not socially acceptable." [121] Dr. Ibanez concluded that petitioner's "judgment represents manifestations that are harmful to the patient in view of his unwillingness to take medication and continue follow-up treatment," a conclusion echoed by Drs. Cruz [122]

115. *See Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir.1993) ("Because the state court's determination that [petitioner] was mentally ill and dangerous was a mixed question of fact and law, it is not entitled to section 2254(d) [currently section 2254(e)(1)]'s presumption of correctness.").

116. *Matter of Francis S.*, 206 A.D.2d 4, 23, 618 N.Y.S.2d 660, 671 (1st Dept.1994).

117. Dr. Delfin Ibanez, who examined petitioner at South Beach, testified that petitioner suffered from bipolar disorder, episodes of psychotic misperception and antisocial personality disorder. Pet. Ex. 13, Tr. 72–73. Dr. Erasmo Cruz, who also examined petitioner at South Beach, testified that petitioner suffered from manic and recurrent bipolar disorder. Pet. Ex. 14, Tr. 939. Dr. Robert Poundstone who treated petitioner at the Kirby Forensic Psychiatric Center concluded that petitioner suffered from bipolar disorder, attention deficit disorder and antisocial personality disorder. Pet. Ex. 15, Tr. 219, 300.

118. Dr. Azariah Eshkenazi testified that petitioner suffered from bipolar disorder although he believed the condition to be in remission. Pet. Ex. 16, Tr. 361, 374. Dr. Nels Langsten, who was hired by petitioner's girlfriend to testify and did not review any of petitioner's medical records nor talk to the other treating psychiatrists, testified that petitioner suffered from cyclothemia, a milder form of bipolar disorder, as well as attention deficit hyperactivity disorder, antisocial

and narcissistic personality disorders and severe manic episodes. Pet. Ex. 17, Tr. 435, 436. Finally, another hired expert, Dr. Michael Welner, testified that petitioner suffered from attention deficit hyperactivity disorder, narcissistic and antisocial personality disorders, but not bipolar disorder. Pet. Ex. 18, Tr. 542–48.

119. *See*, e.g. Pet. Ex. 13, Tr. 73, 93, 107.

120. Petitioner's memorandum of law in support of his petition raises numerous minor points on which he disagrees with the testimony of the various doctors. However, even by his own admissions, each of the psychiatrists testified as to the existence of petitioner's mental disorder. Therefore, while he might dispute the general conclusions to be drawn from the doctors' diagnoses, petitioner himself does not even colorably demonstrate the insufficiency of the evidence to support the mental illness prong of the CPL § 330.20(14) recommitment test.

121. Pet. Ex. 13.

122. Pet. Ex. 14 at 3 ("In view of his strong denial that he has any emotional illness and his strong assertion that he does not need to take any psychotropic medication upon release from the hospital; in addition, with a past history of alcohol (sic) abuse and polysubstance abuse; ....it is my professional opinion that patient is a continuing danger to himself and others when left on his own on the outside.").

and Poundstone.[123] Similarly, several of the doctors concluded that petitioner most likely would be incapable of complying with the drug and alcohol treatment program that was necessary to control many of his dangerous impulses outside of the confined setting of a hospital.[124]

Most importantly, the record before the hearing court included petitioner's twenty-six arrests and numerous previous criminal charges and convictions, almost all for violent and threatening behavior and many of which occurred while petitioner was released on an order of conditions.[125] That petitioner committed these acts is entitled to the strong presumption of correctness, and petitioner has not raised clear and convincing evidence to the contrary.[126]

Applying the legal standards to these facts, the Appellate Division, and the Court of Appeals to the extent it engaged in fact finding, concluded that petitioner suffered from a dangerous mental disorder within the meaning of CPL § 330.20. This Court agrees. As there is no constitutional barrier to the definition of "current dangerousness" as interpreted by the Appellate Division and Court of Appeals, petitioner quite clearly meets the standard of dangerous mental disorder. As for the issue of mental illness, there is essentially no dispute that petitioner suffers from bipolar disorder, antisocial disorder, and attention deficit disorder.

Because the Appellate Division's determination that petitioner was mentally ill and dangerous and the Court of Appeal's affirmance of that determination were well supported by the overwhelming weight of the evidence presented at the recommitment

hearing, the decision to recommit petitioner was not "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." [127] Therefore petitioner is not entitled to habeas relief on that basis.

*Conclusion*

For the foregoing reason, the Court treats the application for a COA as a motion for reconsideration and grants that motion. On reconsideration, the contention that the manner in which the recommitment proceeding was commenced violated petitioner's constitutional rights is dismissed. The petition is denied on the merits in all other respects. The Court hereby grants a COA as to petitioner's first and third grounds for relief as described at pages 13–14 and denies a COA with respect to the other grounds raised by petitioner.

SO ORDERED.

---

**123.** *Matter of Francis S.*, 206 A.D.2d 4, 14, 618 N.Y.S.2d 660 (1st Dept.1994). This conclusion of Dr. Poundstone's was reported in the Appellate Division's opinion, but Dr. Poundstone's report itself was not in the record before this Court. The presence or absence of Dr. Poundstone's diagnosis on this point does not affect this Court's ultimate conclusion of petitioner's dangerousness.

**124.** *See* Pet. Ex. 16, Tr. 393 (Dr. Eshkenazi's testimony that "the drug and alcohol program is what's indicated. I would feel better with residential program for drug and alcohol rather than be outside, because the temptation is there."); Pet. Ex. 17 (Dr. Langsten's report that petitioner's "substance use may have been an attempt by

him to self medicate [but] could well have exacerbated his tendency toward impulsivity and hypomania" and recommending alcohol abuse treatment); Pet. Ex. 18 (Dr. Welner's report finding petitioner suffers from alcohol dependence and polysubstance abuse).

**125.** *See generally Matter of Francis S.* 206 A.D.2d 4, 618 N.Y.S.2d 660 (recounting petitioner's extensive criminal history).

**126.** *Kansas v. Hendricks*, —— U.S. ——, ——, 117 S.Ct. 2072, 2080, 138 L.Ed.2d 501 (1997) ("previous instances of violent behavior are an important indicator of future violent tendencies").

**127.** *See* 28 U.S.C. § 2254(d)(2).